Jeffrey L. Willis (#004870)
Benjamin W. Reeves (#025708)
Michael B. Reynolds (*pro hac vice*)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:    602.382.6506
Facsimile:    602.382.6070
E-Mail:       jwillis@swlaw.com
              breeves@swlaw.com
              mreynolds@swlaw.com
Attorneys for Defendants 597 Broadway Realty,
LP, Shui Yee Lee, and Sabeth I. Siddique

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LREP Arizona, LLC, a Texas limited liability company,<br><br>              Plaintiff,<br><br>      v.<br><br>597 Broadway Realty, LP, a New Jersey limited partnership; Shui Yee Lee; and Sabeth Siddique,<br><br>              Defendants. | No. 2:16-cv-04015-DLR<br><br>**RESPONSE TO MOTION TO DISMISS COUNTERCLAIM**<br><br>(Oral argument requested) |
| 597 Broadway Realty, LP, a New Jersey limited partnership; Shui Yee Lee; and Sabeth Siddique,<br><br>            Counterclaimants,<br><br>      v.<br><br>LREP Arizona, LLC, a Texas limited liability company,<br><br>             Counterdefendant. | |

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

1

## I. **INTRODUCTION**

2      Plaintiff and Counterdefendant LREP Arizona, LLC ("LREP") seeks to dismiss a

3   counterclaim for fraud based on waivers that it procured by the very same fraud that

4   underlies the counterclaim. To be sure, LREP is correct to distinguish between fraud in

5   the inducement with respect to (1) the personal guaranties signed by Lee and Siddique

6   (the "Guaranties") and (2) the forbearance agreement (the "Forbearance") that contained

7   the waivers signed by Lee and Siddique ("Counterclaimants"). But the distinction does

8   not change the outcome of LREP's motion to dismiss, which must be denied. This is

9   because the Forbearance—and the waivers contained therein—were also procured by

10   fraud and are therefore unenforceable.

11      Not long before LREP filed its motion, Lee and Siddique learned that Michael

12   Allen and Karen Blandini, who were masquerading as Lee and Siddique's agents,

13   fiduciaries and loan brokers, were actually agents of LREP. Having gained their trust,

14   LREP steered Lee and Siddique towards the LREP loan (the "Loan") on terms that are

15   objectively unconscionable: a 46% interest rate, loan fees exceeding 20% of the amount

16   allegedly lent, Arizona law and venue (despite the parties to the transaction having no

17   connection to Arizona), waivers of various borrower and guarantor protections, etc. LREP

18   and the borrower, G Companies, conspired to bring Counterclaimants into the transaction

19   by concealing the fact that the borrower never intended to repay the loan, by lying about

20   the value of the collateral securing the loan, by misrepresenting the Loan terms that were

21   actually available in the marketplace, as well as the loan terms that had been agreed to by

22   the borrower and lender. They lied about the worthlessness of the collateral, all the while

23   reassuring Counterclaimants that they would never have to pay on the Guaranties. They

24   lied about how the proceeds of the Loan would be used—indeed, far less than $4,000,000

25   was lent, and none of the money went to Lee, Siddique or any business in which they had

26   any interest. They scammed Lee and Siddique, pure and simple.

27      Still not realizing they had been swindled—and thus not realizing they had

28   defenses against payment of the Guaranties—Lee and Siddique became terrified of the

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    financial consequences of the LREP Loan when they learned G Companies had defaulted.

2    LREP (by and through its double-agent, Blandini) used this fear to pressure Lee and

3    Siddique into signing the Forbearance—which purportedly waived various defenses of

4    which they knew nothing—and paying nearly $2 million for the privilege of obtaining a

5    worthless Forbearance. In sum, the Forbearance fails for lack of consideration, was

6    procured by fraud, and is otherwise unenforceable—as are the Guaranties.

7    **II.**    **STATEMENT OF FACTS**

8         **A.**    **Counterclaimants Are Victims of a Complex Fraudulent Scheme.**

9              **1.**    **Counterclaimants Seek Financing for their Business.**

10        In or about February 2015, Counterclaimants met with G Companies front men

11   Michael Buskey and David Gianulias as part of their efforts to raise capital to operate

12   their international beef and cattle business, Texas International Beef & Cattle ("TIBC").

13   [Dkt. 61 (¶ 7).] Buskey and Gianulias said that they and G Companies had financial

14   instruments that could serve as collateral for a $250 million Credit Line ("Credit Line")

15   for TIBC. [*Id.*] Buskey and Gianulias also told Counterclaimants to provide a deposit of

16   $3 million (the "$3 Million Deposit"), which they obtained from an investor named John

17   Horton ("Horton"). [*Id.*, (¶¶ 8-9).]

18        Buskey and Gianulias never got the Credit Line as promised, and Horton

19   demanded his money back. [*Id.*, (¶ 10).] To keep the $3 Million Deposit in place, and to

20   stop Horton from filing a lawsuit (as he was threatening), Buskey and Gianulias

21   convinced Counterclaimants to guarantee a new loan to repay Horton. [*Id.* (¶ 11).]

22              **2.**    **LREP, Buskey, and Gianulias Conspire to Fraudulently Induce**
23                          **Counterclaimants into Guaranteeing the Loan.**

24        Buskey and Gianulias negotiated with LREP about what would become the Loan.

25   [*Id.*, (¶¶ 12-13).] The salient deal points were as follows:

26              (i)    The Loan would be non-recourse, meaning that it could not be

27   enforced against the borrower if the borrower was unwilling to pay. [*Id.*]

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

(ii)    The borrower was to be G Companies Management, LLC ("G Companies"), which was Buskey's and Gianulias's company, and in which Counterclaimants have never had any interest. [*Id.*, (¶ 18).]

(iii)    The Loan was to be secured by real property in San Juan Capistrano, California (the "Property"). [*Id.*, (¶ 13, 18).]

(iv)    Buskey and Gianulias would convince Counterclaimants to guarantee the Loan by downplaying the risks, telling them they could and would repay it, and that the collateral Property was worth at least double the Loan amount. [*Id.*]

LREP knew that Buskey and Gianulias' representations were false but withheld that knowledge from Counterclaimants. [*Id.*, (¶ 12).] Worse yet, they affirmatively and knowingly represented the opposite. Blandini—who was actually a decision-maker for LREP—pretended to be Counterclaimants' fiduciary and told them that the Property was worth between $10 million and $27 million—a figure that would have taken the risk out of the Guaranties but which proved to be almost 9,000% higher than the Property's actual sale price. [*Id.*, (¶¶ 16, 28).][1] She further assured them that they should have no concerns about providing personal guaranties for the Loan due to the value of the Property. [*Id.*]

She never told them that she was not an independent broker, but an agent of LREP all along. [Dkt. 71, 16:16-20 (admitting that "Blandini [is] a representative of LREP…".] Instead, she assured them that she was working for the best interests of Counterclaimants to find the best loan terms possible, that Counterclaimants were her clients and that she owed them a fiduciary duty of loyalty and care. She therefore steered Counterclaimants towards the LREP transaction, whose terms were unconscionable.

---

[1] On August 9, 2018, counsel for the parties participated in the Rule 26(f) conference. During this conference, LREP's counsel admitted that Blandini and Allen are LREP's decision-makers. [*Id.*] But at the time they Guaranteed the Loan, Lee and Siddique believed Blandini and Allen were acting on their behalf. Indeed, before the Loan was executed, Blandini stated to Counterclaimants that they were her and Allen's "clients" and that her goal was to get Counterclaimants "the lowest and best terms" for a Loan.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

### 3.      The Terms of the Loan are Unconscionable.

On October 7, 2015, LREP purported to lend $4,000,000 to G Companies. [Dkt. 61, (¶ 17).] Although the face amount of the Loan was $4,000,000, LREP funded only $3,300,000 (at most) and the rest was withheld as an origination fee and prepaid interest. [*Id*., (¶ 20).] G Companies purportedly received only $1,375,430 of the proceeds of the Loan. [*Id*.] Counterclaimants received no proceeds from the Loan, nor did any business entity managed or owned by Counterclaimants. [Dkt. 36-1, (¶4).]

The terms of the Loan were completely one-sided in favor of LREP and its co-conspirator, G Companies. The Loan included contract interest at the rate of 36% per annum and default interest at the rate of 46% per annum. [*Id*., (¶ 19).] The Loan also included Arizona choice of law and venue provisions to circumvent the usury laws in the residence states of G Companies and Counterclaimants, even though none of the parties have any connection to Arizona. [*Id*.]

LREP and G Companies conspired to swindle Counterclaimants. They knowingly concealed the fact that G Companies had no intention to repay the Loan. They structured the Loan in a manner that did minimal harm to G Companies and maximum harm to Counterclaimants. [*Id*., (¶ 24).] For example, the Loan is non-recourse to G Companies, meaning that LREP cannot enforce the Loan from G Companies if G Companies chooses to breach. They lied about G Companies' ability and willingness to repay the Loan voluntarily, and the value of the collateral securing the Loan. [Dkt. 1, (Ex. A, § 5.2.4); Dkt. 61, (¶¶ 16, 28).]

Critically, neither Counterclaimant was ever included in the negotiations over the LREP Loan. But LREP (via Allen and Blandini) misrepresented some terms of the deal when they procured the Guaranties and withheld all of the actual terms until they told Counterclaimants to sign the Forbearance—negotiations at the point of bayonet!

- 4 -

### 4. Unaware of the Fraud, Counterclaimants Pay LREP Nearly $2 Million and Execute Various Agreements.

Unaware that their personal guaranties were procured through fraud, Lee and Siddique executed multiple agreements with LREP, including the Forbearance, and paid nearly $2 million. [*Id.*, (¶ 29-30).] Shortly thereafter, LREP filed this action seeking recovery of the remainder of the Loan, which was allegedly $4,626,487.32 at the time of filing. [Dkt. 1, (¶ 19).] Thus, despite receiving none of the Loan (either for themselves or for any business in which they had an interest), Counterclaimants have paid nearly $2 million to LREP, are being sued for an additional $4.6 million (plus accruing interest at 46%), and have lost the $3 Million Deposit.[2]

LREP's representations to perpetrate the scheme also included the following:

- Blandini informed Counterclaimants that G Companies defaulted on the Loan, and pressured them to obtain a new loan to pay back LREP (because, as is now known, she and Allen received at least some of the Loan proceeds).

- On numerous occasions after G Companies defaulted, Blandini and Allen requested that Counterclaimants send them their updated financial information to provide a roadmap for judgment enforcement proceedings.

- After the Loan was foreclosed, Randy McCaskill, LREP's lawyer, e-mailed Counterclaimants and encouraged them to work with Blandini and Allen to find options to pay back the LREP Loan. At the time, Counterclaimants thought Blandini and Allen represented them and thus would act in their best interest, but they now know they were being misled to enrich Blandini and Allen.

- To encourage Counterclaimants to pay back the Loan, Blandini and Allen provided Counterclaimants with term sheets for loans with significantly better terms than the LREP Loan (interest rates ranging from 4.5% to 9% per year). This puts the lie to Blandini's and Allen's statements to Counterclaimants that the LREP Loan terms were the best available.

- In March 2017, Counterclaimants obtained a $2,460,000 loan (with the assistance of Blandini and Allen) to pay back a portion of the Loan. The loan was paid to LREP's designee, A & B Investments, LLC. Counterclaimants recently discovered that A & B Investments, LLC is an entity owned and controlled by Blandini and Allen. Blandini and Allen also received $24,000 as their fee for facilitating the loan for Counterclaimants.

---

[2] Dr. Lee and Mr. Siddique filed a lawsuit against Messrs. Buskey, Gianulias, and others in the State of California, Orange County Superior Court (Case No. 30-2017-00959639-CU-BC-CJC). The case is still pending.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

### III.   **LEGAL ARGUMENT**

Motions to dismiss under Rule 12(b)(6) face a high procedural bar. The Court must construe the factual allegations in the Counterclaim liberally, as true, and draw all reasonable inferences in Counterclaimants' favor. *Bernhardt v. Cty. of Los Angeles*, 279 F. 3d 862, 867 (9th Cir. 2002). This means that the Court must assume that—as alleged in the Counterclaim—LREP engaged in a conspiracy with G Companies to defraud Counterclaimants into guaranteeing the Loan.[3] Ambiguities in the pleadings are resolved in Counterclaimants' favor. *Internat'l Audiotext Network, Inc., v. AT&T Co.*, 62 F.3d 69, 72 (2nd Cir. 1995).

Likewise, LREP's Rule 9(b) Motion faces a difficult procedural burden. This is because "'a plaintiff in a fraud-by-omission suit faces a slightly more relaxed burden, due to the fraud-by omissions plaintiff's inherent inability to specify the time, place, and specific content of an omission in quite as precise a manner.'" *Schellenbach v. GoDaddy.com LLC*, 2017 WL 192920, at *2 (D. Ariz. Jan. 18, 2017) (quoting *Tait v. BSH Home Appliances Corp.*, 2011 WL 3941387, at *2 (C.D. Cal. Aug. 31, 2011)).

LREP's Motion falls well short of the requirements for dismissal under Rules 12(b)(6) and 9(b). LREP essentially asserts two arguments. First, LREP contends that Counterclaimants contractually waived all defenses by entering into the Forbearance. Second, LREP argues that the fraud claim is inadequately pled and fails as a matter of law. Neither argument withstands scrutiny.

The waivers in the Forbearance are unenforceable because (i) the Forbearance was procured by fraud on the part of LREP and its co-conspirators (G Companies, Buskey, and Gianulias, whom Counterclaimants are suing in California), (ii) the waiver is insufficiently specific to waive fraud, and (iii) the entire transaction (and the purported waiver provisions) is substantively and procedurally unconscionable.

---

[3] LREP improperly cites to its own complaint and court filings to establish various "facts" on which it relies for its Motion.  Only factual assertions in the ***Counterclaim*** are treated as true.

Further, LREP's fraudulent misrepresentations regarding the value of the real estate collateral were more than merely non-actionable opinions. Opinions such as appraisals are actionable where, as here, they are expressions of fact and not mere puffery, and where, as here, the speaker knows they are false or recklessly disregards the likelihood that they are false. The misrepresentation regarding the value of the collateral is not the only actionable misrepresentation that plagued a course of dealing fraught with lies. LREP's pervasive fraudulent conduct is identified with sufficient specificity. To the extent the Court disagrees, any deficiency should be cured in an amended pleading.

### A.   Counterclaimants Did Not Waive Their Fraud Claims and Defenses.

LREP argues that Counterclaimants waived **all** of their rights—including the right not to be defrauded—by virtue of the general and unspecific waiver clause in the Forbearance. LREP is wrong for at least three reasons. First, a general waiver (such as the one found in the Forbearance) does not release a claim for fraudulent inducement. *Matsuura v. Alston & Bird*, 166 F.3d 1006, 1010 (9th Cir.), *opinion amended on denial of reh'g*, 179 F.3d 1131 (9th Cir. 1999) (requiring a "clear statement" for "release of a fraudulent inducement claim"). Second, the Forbearance and the waivers contained therein were themselves procured by fraud because Counterclaimants did not realize at the time they entered into the Forbearance that the Guaranties were voidable. Third, the entire Loan transaction is so unconscionable that the contracts (including the Forbearance) are unenforceable as a matter of law. *Maxwell v. Fid. Fin. Servs., Inc.*, 184 Ariz. 82, 89 (1995) ("Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.").

### 1.   A General Waiver Does Not Waive Fraud.

The waiver in the Forbearance Agreement merely provides that Counterclaimants "waive any defense under the deficiency laws to the collection of the Indebtedness from Guarantors." [Forbearance Agreement, ¶ 2.] LREP argues that this bare-bones language is sufficient to waive the Counterclaims. This argument fails because: (a) the Court has

already found that the waiver does not waive all of Counterclaimants' rights, (b) Arizona law requires clear evidence that a party intended to, and did, knowingly waive a right, and (c) fraudulent inducement defenses cannot be waived by a general release.

### a.  Counterclaimants Did Not Waive All Their Rights.

By granting Counterclaimants' Rule 60 Motion, the Court already determined that Counterclaimants did not waive the right to service of process. Thus, there is precedent in this case that holds that the waiver clause is not a complete waiver of any and all arguments that Counterclaimants may raise in this proceeding.

### b.  Arizona Law Will Not Enforce the Waiver.

Under Arizona law, a waiver must be clear to show that the party thoughtfully and intelligently waived a known right. *Am. Continental Life Ins. Co. v. Rainer Constr. Co.*, 125 Ariz. 53, 55 (1980) ("Waiver is either the express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment."). Nothing in the simple language in the Forbearance Agreement suggests that Counterclaimants (i) knew that they had been fraudulently induced into signing the Guaranties, or (ii) knew that they were waiving the right to contest LREP's illegal activities. Since Arizona law requires a "clear showing of an intent to relinquish" a right, the negligible contractual language does not suffice to constitute a waiver of the Counterclaim as a matter of law. *Jones v. Indus. Comm'n*, 1 Ariz. App. 218, 223 (1965) (quoting *Greninger v. Fischer*, 81 Cal.App.2d 549, 554, 184 P.2d 694, 697 (1945)); *see also Cordova v. Lucero*, 129 Ariz. 184 (App. 1981) (requiring clear and compelling evidence of a voluntary and intentional abandonment of a known right). At the very least, *i.e.*, if LREP's argument does not fail as a matter of law, the scope and enforceability of the waiver should present "a question of fact to be determined by the trier of fact." *Chaney Bldg. Co. v. Sunny Side Sch. Dist. No. 12*, 147 Ariz. 270, 272–73 (App. 1985). Accordingly, the Counterclaim must survive LREP's Motion.

### c.   Fraudulent Inducement Claims Cannot Be Waived.

Several courts recognize that claims of fraudulent inducement are not waived unless specifically identified in a waiver clause. *Matsuura*, 166 F.3d at 1011 (declining to enforce unintended waiver and release of fraud claims under Delaware law); *Dakota Partners, L.L.P. v. Glopak, Inc.*, 634 N.W.2d 520, 524 (N.D. 2001) (concluding that "an analysis of the language of the waiver is necessary" to determine whether the defense of fraud has been specifically waived); *Sec. Holding v. Johnson*, 231 N.W. 536, 538 (S.D. 1930) (defendant is not automatically estopped from raising a fraudulent inducement defense when note contains a waiver-of-defenses clause).

These authorities fit under the Arizona waiver rubric, because a party cannot waive a claim that the party does not know it has. Indeed, if—as Counterclaimants allege—they were defrauded into signing the Guaranties and Forbearance Agreement, then they did not know about the fraudulent inducement claim when they purported to sign the waiver. As such, they could not have "knowingly" waived any such claim under Arizona law. At a minimum, the waiver issue presents a disputed issue that will require the Court to take evidence to resolve. As such, dismissal is inappropriate.

### 2.   The Forbearance Does Not Enhance the Waiver.

LREP argues that because Counterclaimants signed the Forbearance after G Companies defaulted, this somehow enhances the breadth and scope of the waiver. It does not. Under Arizona law, an unconscionable contract cannot be cured of its unconscionability by a subsequent contract that reiterates the terms of the original, unconscionable contract. *Maxwell*, 184 Ariz. at 91. In other words, the mere fact that Counterclaimants entered the Forbearance does not cure the overall unconscionability of the transaction as a whole.

In *Maxwell*, for example, a lender loaned $6,512 to Maxwell to finance the purchase and acquisition of a defective solar water heater. The loan accrued interest at 19.5%, had a term of ten years, and was secured by a lien against Maxwell's house. Four years after making the original loan, the lender lent an additional $800 to Maxwell. To

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

memorialize this second loan, Maxwell signed new loan documents that combined the existing balance owed under the original loan with the new $800 loan on the same terms as the original loan. The total amount of the debt (with interest) against the home was approximately $17,000—nearly half the value of the home.

Maxwell sued the lender to obtain a judgment that the original loan was unconscionable and, therefore, unenforceable. The trial court ruled that the doctrine of novation barred Maxwell's claim. Essentially, the trial court concluded that by agreeing to the second loan (in the amount of $800), Maxwell lost the right to challenge the first loan (in the amount of $6,512). This is essentially the same argument LREP urges in the Motion vis-à-vis the Guaranties and Forbearance. Significantly, the Supreme Court of Arizona disagreed with this position.

The Supreme Court concluded that "[a]ssuming that Maxwell's original debt obligation was unenforceable because the contract was unconscionable at the time it was entered into, **then Maxwell had neither obligation nor duty, and therefore nothing for which a novation could substitute, discharge, or extinguish**." *Maxwell*, 184 Ariz. at 91 (emphasis added). Accordingly, the Supreme Court found that the trial court erred by not "first resolving the legal question of whether the [first] contract was unconscionable because a condition precedent to a valid novation is a previous *valid* duty or obligation." *Id.* (emphasis in the original).

*Maxwell* is instructive for two reasons. First, the terms of the Loan are objectively unconscionable and, therefore, unenforceable under Arizona law. *See* A.R.S. § 47-2302(A) (providing remedies for unconscionable contracts). The mere fact that LREP reiterated the Loan terms in the Forbearance Agreement does not cure their unenforceability. Under *Maxwell*, in fact, the Forbearance Agreement is void because the original loan agreement is invalid. *Maxwell*, 184 Ariz. at 91 ("[C]ourts will not lend their hand to the enforcement of oppressive contracts."); *see id.* at 90 ("[A] claim of unconscionability can be established with a showing of substantive unconscionability alone, especially in cases involving either price-cost disparity or limitation of remedies.").

- 10 -

At a bare minimum, the Loan terms (which are more onerous than those in *Maxwell*) require the Court to take evidence regarding unconscionability. *See* A.R.S. § 47-2302(B) ("When it is claimed…that the contract or any clause thereof may be unconscionable the parties **shall be afforded a reasonable opportunity to present evidence**…."). Second, by analogy, *Maxwell* indicates that a contract, such as the Guaranties, that is void or voidable based on fraudulent inducement cannot be ratified by a subsequent contract, such as the Forbearance, which is likewise procured by fraudulent inducement. As such, dismissal is inappropriate at this time.

### 3.     The Waiver is Irrelevant Because the Debt is Satisfied.

Last, the waiver in the Forbearance is irrelevant because the debt owing under the Guaranties has been satisfied as a matter of law under A.R.S. § 33-814(D), which provides that a lender's failure to assert a deficiency action within ninety days of a trustee's sale means that "the proceeds of the sale, regardless of amount, shall be deemed to be in full satisfaction of the obligation and no right to recover a deficiency in any action shall exist." As explained in the Rule 60 Motion to Vacate Judgment (Dkt. 36), this statute of repose cannot be waived or tolled as a matter of law. Thus, the supposed waiver of defenses to the debt is immaterial because the debt is no longer owed as a matter of law.[4]

### B.     The Counterclaim Adequately Pleads Fraudulent Inducement.

A claim of fraudulent inducement requires "proof of all nine of the elements of actionable fraud." *Lundy v. Airtouch Comm., Inc.*, 81 F. Supp. 2d 962, 968 (D. Ariz. 1999). LREP challenges only three elements of Counterclaimants' fraudulent inducement claim: (i) opinions of value cannot constitute an actionable misrepresentation, (ii) Counterclaimants had no right to rely on LREP's gross misrepresentations as to value, and (iii) although it did represent value, it had no duty to do so. Based on these three premises, LREP contends that its assertion that the Property was worth $27 million

---

[4] In any event, it cannot be seriously contended that Counterclaimants ***knowingly*** waived the statute of repose (or any of their other defenses) when they signed the Forbearance.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

(almost 9,000% greater than the foreclosure sale price) was not a fraudulent misrepresentation. These arguments do not entitle LREP to dismissal as a matter of law.

First, opinions can constitute fraudulent misrepresentations if and when the person making the representation knows it to be false or when the opinion is based on assertions of fact. Restatement (Second) of Torts § 539 (1977). Second, Counterclaimants absolutely had a right to rely on LREP's misrepresentations because Blandini held herself out as Counterclaimants' broker and stood in a position of superior knowledge. *In re King Street Investments, Inc.*, 219 B.R. 848, 857 (9th Cir. B.A.P. 1998). Her conduct is especially egregious considering that she was actually LREP's principal and concealed her adverse relationship from Counterclaimants. Third, even if LREP had no duty to disclose the value of the Property, once it did so, "it had a duty to speak fully and truthfully." *In re Apollo Grp., Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005).

### 1.    Opinions Can Constitute Actionable Fraud.

The Motion attempts to draw a bright line between fact and opinion for fraud claims. The distinction, however, is not as clear as LREP suggests. "[O]pinions may trigger liability for fraud when they are not honestly held by their maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion." *United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018) (citing Restatement (Second) of Torts § 539(1)(a)). The Restatement of Torts "recognizes that '[a] statement of opinion as to facts not disclosed and not otherwise known to the recipient may' in some circumstances reasonably 'be interpreted by him as an implied statement' that the speaker 'knows facts sufficient to justify him in forming' the opinion, or that he at least knows no facts 'incompatible with [the] opinion.'" *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1330–31 (2015). This is especially true when the speaker—LREP/Blandini in this instance—has "special knowledge of facts unknown to the recipient[.]" *Id.* (quoting Restatement (Second) of Torts § 539, cmt. b.).

The comments to the Restatement provide several examples of so-called opinions that constitute actionable misrepresentations. For example, a seller of property cannot

represent to a buyer that a tenant is a "good tenant" if the seller knows that the tenant only pays under the threat of legal proceedings. Restatement (Second ) of Torts § 539, cmt. a. Further, an auditor cannot claim that a company is in sound financial condition if (i) the auditor has not done the work needed to reach that conclusion, or (ii) the facts do not justify the opinion. *Id.* at cmt. b (noting that "[t]he opinion thus becomes in effect a short summary of those facts [reviewed by the auditor]."). As these examples show, representations labeled as "opinions" can constitute actionable misrepresentations. The Restatement recognizes this especially when the speaker holds herself out as an expert with superior knowledge—which LREP/Blandini did here in regard to the Property value. *Id.* In short, "[a]lthough some allowance must be made for puffing or depreciation by an adverse party," LREP/Blandini's assertion that the Property was worth $27 million "is so far removed from the truth as to make it a fraudulent misrepresentation." *Id.* at cmt. a.[5]

### 2.    *Gould v. M & I Marshall & Isley Bank* Does Not Apply.

LREP inappropriately relies on *Gould v. M & I Marshall & Isley Bank*, 860 F. Supp. 2d 985 (D. Ariz. 2012) to argue that a statement about "inflated property values is not an allegation of false representation of fact that can support a fraud claim." [Motion, 2:1–2.] *Gould* is distinguishable for several reasons.

First and foremost, despite having three opportunities to do so, the borrowers in *Gould* failed to allege the who, what, where, when and why regarding the alleged misstatements at issue. *Id.* at 988.  Here, the Counterclaim alleges the details of the misrepresentation. Blandini—allegedly acting as Counterclaimants' broker (which, in and of itself constitutes yet another misrepresentation since Blandini is LREP's representative)—assured Counterclaimants that the value of the Property was upwards of $10 million to $27 million to induce Counterclaimants to sign the Guaranties. Blandini and LREP also concealed the fact that they knew that G Companies would never repay the

---

[5] Thus, Blandini/LREP's assertion of value would be actionable even if Blandini had been open and honest about loyalty to LREP, the adverse party.

loan, and that much of the Loan would never even go to the borrower. As noted above, these misrepresentations are actionable under the Restatement (Second) of Torts § 539.

Second, the *Gould* court found that there was no fiduciary relationship between the lender and borrowers in that case such that the lender had no duty to disclose. *Gould*, 860 F. Supp. 2d at 889. Here, a fiduciary relationship exists because Blandini—though actually working on behalf of LREP—held herself out and acted as Counterclaimants' broker. Under Arizona law, "[a] broker owes a fiduciary duty to disclose material facts to its client . . . [and] also must disclose facts it 'knows or has reason to know that the principal would wish to have . . . or [if] the facts are material to the agent's duties to the principal.'" *Lerner v. DMB Realty, LLC*, 234 Ariz. 397, 407–08 (App. 2014) (quoting Restatement (Third) of Agency § 8.06(2)). In fact, a broker "occupie[s] a confidential and fiduciary relationship with [its client] and [is] thereby held to the highest ethical standards of fairness and honesty." *Marmis v. Solot Co.*, 117 Ariz. 499, 501 (App. 1977). Blandini's involvement on both sides of the Loan removes this case from the purview of *Gould*.

Third, the lender in *Gould* obtained the appraisal for its own underwriting purposes and expressly declined to disclose it to the borrowers. *Gould*, 860 F. Supp. 2d at 990. By contrast, here, LREP and Blandini purportedly did their own survey of the Property and made their own determination of its value. Then, LREP/Blandini represented that the actual value of the Property was between $10 million and $27 million, actively used that representation to induce Counterclaimants to sign the Guaranties, all the while knowing or suspecting the Property was really worth only $315,000.

The facts and circumstances of this case vary greatly from those asserted in *Gould* and, accordingly, the Court should not apply *Gould* here.

### 3. Counterclaimants Justifiably Relied on the Misrepresentations.

Counterclaimants' reliance on the fraudulent misrepresentations was justifiable under the circumstances. *King Street*, 219 B.R. at 857. Blandini held herself out as Counterclaimants' broker, asserting that she was working to get Counterclaimants the best deal possible. She grossly misrepresented the value of the Property. In *King Street*, a

broker made a similar (but less egregious) representation of value (~$205,000 when the value was $40,000). *King Street* affirmed a judgment based on that misrepresentation, holding that "'[i]n view of the existing confidential relationship and the superior knowledge of the agents, plaintiffs had a right to rely upon the statements and recommendations that were made to them, and had no duty to make an independent investigation.'" *Id.* at 857 (quoting *Schoenberg v. Benner*, 59 Cal.Rptr. 359, 365 (App. 1967)). Counterclaimants, therefore, justifiably relied on their broker's representations.

### 4. LREP's Duty to Disclose.

#### a. LREP Had a Duty to Disclose.

LREP cites to the Restatement (Third) of Suretyship & Guaranty § 12 (1996) to show that it had no affirmative duty to disclose facts. But the illustrations to this Restatement section clearly show that LREP and Blandini owed Counterclaimants a duty.

> (4)    [W]hether the obligee has reason to believe that (i) facts unknown to the secondary obligor materially increase the risk beyond that which the secondary obligor intends to assume and (ii) such facts are unknown to the secondary obligor, shall be determined in light of the obligee's reasonable beliefs as to:
>
> > (a)    the nature of the secondary obligor's relationship to the principal obligor;
> > (b)    the nature of the secondary obligor's business; and
> > (c)    the secondary obligor's ability to obtain knowledge of such facts independently in the exercise of ordinary care.

Under this rule, LREP had a duty to disclose facts if it knew that Counterclaimants were going to incur significantly more risk than they thought they were going to assume. That is precisely what is alleged here. Counterclaimants—based on LREP and Blandini's representations—thought that they were incurring zero risk. The Counterclaim alleges that LREP *knew* that this was a very risky Loan from the Guarantors' perspective, but worked to downplay those risks when dealing with Counterclaimants. Under the Restatement, those facts required disclosure.

Illustrations 1 and 2 to § 12 are instructive:

> 1.    Bank C, seeking to induce S to guarantee Bank C's loan to D, tells S that, based on D's income and expenses, D should have no trouble repaying the loan. S is induced by the statement to make the guaranty. However,

- 15 -

> Bank C knows that D is overextended and is unlikely to be able to pay the loan. Because the statement is a fraudulent misrepresentation, S's guaranty **is voidable**, regardless of whether the misrepresentation is material. (Emphasis added).

The situation here is even more egregious than in Illustration 1 because LREP, unlike "Bank C," actually conspired with the borrower to induce Counterclaimants to sign Guaranties when they knew the borrower had no intention or ability to repay the Loan.

Under Illustration 2, the Guaranties would still be voidable:

> 2.   The facts being otherwise as stated in Illustration 1, Bank C is mistaken, and does not know that D is overextended and unlikely to be able to pay the loan. While Bank C's statement is not a fraudulent misrepresentation, the misrepresentation is nonetheless material; therefore S's guaranty is **voidable**. (Emphasis added).

Even if LREP was unaware of G Companies' financial condition and did not knowingly misrepresent the risk that the Guaranties represented, the Guaranties are voidable.

### b.   Alternatively, LREP Assumed a Duty to Speak Truthfully.

If LREP did not have an affirmative duty to disclose, it assumed a duty to speak truthfully once it spoke. *In re Apollo*, 395 F. Supp. 2d at 920. In *Steinberger v. McVey*, 234 Ariz. 125, 137-38 (App. 2014), for example, the court recognized that the Good Samaritan Doctrine may impose liability on a lender who acts negligently when it chooses to act. There, the lender induced the borrower to default and then negligently failed to timely process a loan modification application so that the borrower faced the prospect of losing her home to foreclosure. The *Steinberger* court held that the borrower asserted a valid claim for negligent performance of an undertaking under Restatement (Second) of Torts § 323, which provides that "a party may assume the duty to act with reasonable care even though it otherwise had no duty to do so." *Id.* at 137 (citing Restatement § 323). Thus, even if LREP had no preexisting duty to speak, it assumed a duty to speak truthfully when it made representations to Counterclaimants.

### C.   Rule 9(b) Issues.

"Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Eminence*

*Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Leave to amend "'shall be freely given when justice so requires.'" *Id.* (quoting Fed. R. Civ. P. 15). Even if the Counterclaim does not plead fraud with sufficient specificity—which it does— Counterclaimants can allege a series of other facts that would show LREP's fraud. Accordingly, if the Court is inclined to grant the Motion, the Court should also grant leave to file an amended pleading.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, Counterclaimants respectfully request that the Court deny the Motion. In the alternative, they respectfully request that the Court grant leave to amend.

DATED this 24th day of August, 2018.

SNELL & WILMER L.L.P.


By: s/Benjamin W. Reeves
Jeffrey L. Willis
Benjamin W. Reeves
Michael B. Reynolds
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Attorneys for 597 Broadway Realty,
LP, Shui Yee Lee, and Sabeth I.
Siddique

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

1

**<u>CERTIFICATE OF SERVICE</u>**

2

3

        I hereby certify that on August 24, 2018, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF System for filing which electronically

4

transmits a Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Randy A. McCaskill
McCaskill Law & Advocacy, PLLC
Post Office Box 13684
Scottsdale, Arizona  85267-3684
Attorneys for Plaintiff

7

8

9

Joseph Roth
Warren J. Stapleton
Osborn Maledon
2929 North Central Avenue
Phoenix, Arizona 85012-2793
Attorneys for Plaintiff

10

11

12

s/ Elizabeth Scott
4838-8698-7632

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28